Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8657 | **DATE** | 7/28/2004 |
| **CASE TITLE** | Cuellar vs. House of Doolittle, et. al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, defendant's motion for summary judgment is granted in part and denied in part. Defendants' motion for summary judgment is granted as to Cuellar's intentional infliction of emotional distress claim and denied as to Cuellar's discrimination claim. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | U.S. DISTRICT COURT | | 37 |
| | Mail AO 450 form. | CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 2004 JUL 28 PM 2:57 | | |
| | | FILED-ED | date mailed notice | |
| MF | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SANDRO CUELLAR, | ) |
| Plaintiff, | ) |
| | ) No. 02 C 8657 |
| v. | ) |
| | ) Judge John W. Darrah |
| HOUSE OF DOOLITTLE, LTD. and | ) |
| BRIAN HENDRICKS, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Sandro Cuellar, filed suit against Defendants, alleging religious discrimination and intentional infliction of emotional distress. Presently before the Court is Defendants' Motion for Summary Judgment.

## BACKGROUND

It is House of Doolittle's employment policy that an employee must call if he or she will be absent from work. (Def.'s 56.1(a)(3) Statement ¶ 19). Doolittle requires a note from a doctor for extended periods of absences and when employees are ill. (Id., ¶ 20). Doolittle also has a policy that company phones and fax machines are intended for business use and not personal use. On occasion, personal use of phones by employees is permitted, if it is not excessive. (Id., ¶ 27).

For payroll purposes, Doolittle employees are expected to punch in and out of work on the computer when they arrive at work and leave for the day. (Def.'s 56.1(a)(3) Statement ¶ 22). Doolittle also requires its employees to punch in and out on the computer for lunch. Written directives have been given to employees to punch in and out for lunch. (Id., ¶ 23).

In October 2001, written performance reviews could only be given if there was a serious problem. Written reviews were deemed necessary when an employee acted in a way that needed to be corrected to let the employee know his or her conduct was serious. If an employee addressed the problems identified in the review, Doolittle would not deem it necessary to write the corrections down. If the conduct continued, Doolittle required the conduct to be written down. (Def.'s 56.1(a)(3) Statement ¶ 30).

On October 19, 2001, Cuellar was given a written performance review. At this review, Doolittle informed Cuellar of "negative things" about his performance. (Id., ¶ 31). Cuellar's review stated that Cuellar's performance over the last year could be rated from exceptional to dreadful. Cuellar's review referenced several meetings between Cuellar and Brian Hendricks; Cuellar and Blethen; and Cuellar, Hendricks and Blethen in an effort to address the dreadful aspects. The review identified areas that needed to be addressed, including: (1) not punching in and out for lunch, (2) playing cards on the premises after being asked to stop doing so, (3) communication and teamwork with fellow employees, (4) punctual arrival at work – the agreed upon start time of 8:00 a.m., (5) working a second job that affected his performance, (6) using company phones and the fax machine for personal business, (7) not showing up on Saturdays after indicating that he would do so, and (8) informing customer service that a specific order would be shipped and it was not. (Id., ¶ 34). Prior to the review, Cuellar had met with Blethen and/or Hendricks to discuss several of these issues, including taking time off from work, not calling in when he missed work, arriving late and leaving early. (Id., ¶¶ 36-42). Cuellar read the written review before he signed it and did not object to anything discussed during the meeting. However, Cuellar asserts that he orally objected to the contents of the review but was

threatened with termination if he did not sign the review. (Id., ¶ 52). Following the October 2001 review, Cuellar's work hours continued to be sporadic; and he continued arriving for work late and leaving early. (Id., ¶¶ 55-56).

Cuellar had a personal business outside his work at Doolittle. Hendricks understood Cuellar's business to be handyman work, painting, and landscaping. Prior to his October review, Hendricks told Blethen that Cuellar's secondary employment was affecting his performance at Doolittle. (Def.'s 56.1(a)(3) Statement ¶ 46). Blethen learned from other employees that Cuellar was using the fax machine for painting quotes, buying and selling cars, and for his personal business. (Id., ¶ 44). Cuellar admits to using the phones and the fax machine for personal uses but denies he used them for his business. (Id., ¶ 45; Plaint.'s Response ¶ 45).

Cuellar left his business's lawn mower on Doolittle's shop floor on more than one occasion. Stavoe spoke with Cuellar a number of times about the lawn mower on the company floor. (Def.'s 56.1(a)(3) Statement ¶ 48). Cuellar also left his truck in Doolittle loading docks during business hours. Cuellar was asked not to do so because his truck affected access to the company by other trucks. (Id., ¶ 49).

On February 23, 2002, Cuellar was baptized a Seventh Day Adventist. Cuellar told Hendricks that he had become a Seventh Day Adventist. (Def.'s 56.1(a)(3) Statement ¶ 28). During Cuellar's employment, Blethen, Hutchinson, and Stavoe were not aware that Cuellar had become a Seventh Day Adventist and could not work Saturdays. (Id., ¶ 29).

In March 2002, Hendricks called Cuellar a "church-going boy." (Def.'s 56.1(a)(3) Statement ¶ 71). Cuellar recalls only one other comment that he considered to be mocking by Hendricks in which Hendricks stated, "I can't believe you; you are Mr. Tough Guy, big-hearted guy." (Id., ¶ 73).

Employees were only asked to work on weekends when Doolitle was falling behind in filling customers' orders. (Plaint.'s 56.1(b)(3) Statement ¶ 82). Working on a Saturday was mandatory when the work required. (Id., ¶ 233). Hendricks told Cuellar and other employees that work on Saturday was required if orders needed to be filled. (Id., ¶¶ 248-249, 251). When Hendricks told Cuellar he had to work Saturdays, Cuellar told him he could not work on Saturdays because of his religious beliefs. (Id., ¶ 253). When Cuellar informed Hendricks that he could not work Saturdays, Hendricks repeatedly threatened Cuellar's continued employment if he did not come to work on Saturday. (Id., ¶¶ 255-259). Cuellar did not work several Saturdays even though he was informed he was required to do so. (Id., ¶ 260).

In 2001, Cuellar only worked one Saturday, April 13, 2001, for 3.73 hours. (Def.'s 56.1(a)(3) Statement ¶ 60). Cuellar did not work any Saturdays in January, February, March, or May of 2002. (Id., ¶ 59). Cuellar had unpaid absences on February 6 and 7, 2002; unauthorized absences on March 5, 6, and 28, 2002; and unpaid leave from April 15-19, 2002. (Id., ¶ 61).

Cuellar's regular working hours were from 8:00 a.m. to 5:00 p.m. (Def,'s 56.1(a)(3) Statement ¶ 18). On May 6, 2002, Cuellar arrived at work at 8:30 a.m. and left work at 3:31 p.m. Cuellar was absent without prior notice on May 7 and 8, 2002. Subsequently, Defendants gave permission for Cuellar to be paid vacation days for the absences. Defendants also told Cuellar to bring in a doctor's note for the absences. Cuellar never provided the doctor's

note. (Plaint.'s Ex. 8, HOD 013). On May 9, 2002, Cuellar arrived at work at 8:10 a.m. and left work at 4:09 p.m. (Def.'s 56.1(a)(3) Statement ¶ 62). Cuellar failed to appear at work on May 13, 2002. (Id., ¶ 64).

On May 14, 2002, Cuellar arrived at work at 8:30 a.m. Cuellar's employment with Doolittle was terminated that same day. (Def.'s 56.1(a)(3) Statement ¶ 65). Doolittle's proffered reasons for terminating Cuellar included: poor work performance, absences from work without authorization, poor attendance, poor management skills, lack of dependability, and failure to provide doctor documentation of his absences. (Id., ¶ 67).

Cuellar sought counseling from his pastor as a result of his emotional distress. (Def.'s 56.1(a)(3) Statement ¶ 78). Cuellar has not received any treatment from a counselor, psychiatrist, psychologist, physician, or medical professional as a consequence of his alleged distress. (Id., ¶ 79). Cuellar's emotional distress consisted of embarrassment when he was "lectured" by his pastor, feeling hurt because he was betraying God, crying at work on a few occasions, sweating, rapid heartbeat, and loss of sleep. (Plaint.'s 56.1(a)(3) Statement ¶¶ 314, 318, 323-326, 329, 335, 338).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (*Celotex*). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when

no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

A party opposing a motion for summary judgment must file a concise response to the movant's statements of material fact, including a response to each numbered statement. In the case of any disagreement, a party opposing the motion must site specific references to the affidavits, parts of the record, and other supporting materials relied upon by the opposing party. The opposing party may also include statements of additional material facts that rebut the moving party's motion. These additional facts must also include references to affidavits, parts of the record, and other supporting materials that support such additional material facts. L.R. 56.1(b)(3).

Title VII makes it unlawful to discharge or to otherwise discriminate against an individual because of that person's religion. 42 U.S.C. § 2000e-2(a)(1). Religion is defined to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Where an employee alleges religious discrimination on the ground that he was unable to fulfill a job requirement due to his religious beliefs or observances, a *prima facie* case requires the employee to demonstrate that the belief or observance was religious in nature, that he called it to the attention of his employer, and that the religious belief or observance was the basis of his discharge. *See Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997) (*Venters*). Remarks and other evidence that reflect a propensity of the decision-maker to evaluate employees based on an illegal criteria suffice as direct evidence of discrimination even if the evidence stops short

of a virtual admission of illegality. *See Venters*, 123 F.3d at 973.

If the plaintiff makes a *prima facie* case, the employer must demonstrate that it would have taken the same action against the plaintiff even if the proscribed criteria had played no role in its decision. *See Venters*, 123 F.3d at 973. The persuasiveness of this showing is normally for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point. *See Venters*, 123 F.3d at 973.

Cuellar has demonstrated that his belief and observance of not working Saturdays was religious in nature and that he called this belief and observance to his employer's attention. Defendants argue that Cuellar has failed to demonstrate that Cuellar's refusal to work on Saturdays was the basis of his discharge. However, Cuellar has provided evidence that raises a genuine issue of material fact as to whether Cuellar's refusal to work on Saturdays was the basis of his discharge. When Cuellar informed Hendricks that he was unable to work on Saturdays because of his religious beliefs, Hendricks repeatedly threatened Cuellar's position with Doolittle.

Defendants also argue that Cuellar has failed to demonstrate that Doolittle would not have fired Cuellar even if his religious observance played no role in its decision. Defendants rely upon the uncontradicted evidence that Cuellar had unexcused absences, failed to provide a doctor's note as requested, and was not meeting Defendants' expectations. However, in light of Hendrick's alleged repeated threats to Cuellar's continued employment if he did not work Saturdays, it cannot be said without reservation that a reasonable finder of fact would be compelled to credit Defendants' case on this point. *See Venters*, 123 F.3d at 973.

7

Based on the above, Defendants' Motion for Summary Judgment as to Cuellar's discrimination claim is denied.

Defendants also seek summary judgment as to Cuellar's intentional infliction of emotional distress claim. To withstand summary judgment on their intentional infliction of emotional distress claim, a plaintiff must establish that; (1) the defendant's conduct was extreme and outrageous, (2) the defendant intended that their conduct would cause severe emotional distress, and (3) the defendant's conduct did in fact cause severe emotional distress. *See Doe v. Calumet City*, 161 Ill. 2d 374, 392 (1994). Furthermore, a co-employee's tortious behavior can only be attributed to its employer where the employer specifically commands or expressly authorizes the co-employee to act in the tortious manner or where the co-employee acts as the alter ego of the employer. *See Whitehead v. AM Int'l Inc.*, 860 F. Supp. 1280, 1290 (N.D. Ill. 1994).

Liability for intentional infliction of emotional distress is only found where the conduct is outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1174 (7th Cir. 1997) (*Oates*). As such, typical employment disputes do not rise to the level of extreme and outrageous conduct. *See Oates*, 116 F.3d at 1174. Insults, indignities, threats, annoyances, petty oppressions, and acts that are rude, unprofessional and unfair do not constitute extreme and outrageous conduct. *See Oates*, 116 F.3d at 1174. Whereas, forcing an employee to commit a criminal act and coerced sexual relationships have been found to constitute extreme and outrageous conduct. *See Piech v. Arthur Anderson & Co.*, 841 F. Supp. 825, 831 (N.D. Ill. 1994).

Here, the alleged extreme and outrageous conduct consists of two isolated incidents when Hendricks made a comment to Cuellar to which Cuellar believed that Hendricks was belittling his religion and the threat that Cuellar would lose his job if he did not work on Saturdays. Such conduct does not constitute extreme and outrageous conduct. *See Oates,* 116 F.3d at 1174.

Even if Hendricks' conduct was considered extreme and outrageous, Cuellar did not experience severe emotional distress. The emotional distress experienced to prevail on an intentional infliction of emotional distress claim must be severe - so severe that no reasonable person could be expected to endure it. *See Public Fin. Corp. v. Davis,* 66 Ill. 2d 85, 90 (1977) (*Davis*). Emotional distress such as fright, horror, grief, shame, humiliation and worry alone do not constitute severe emotional distress. *See Davis,* 66 Ill. 2d at 90; *Sanglap v. LaSalle Bank, FSB,* 2002 WL 47969 (N.D. Ill. Jan. 11, 2002) (feeling like being excluded from the human race, feeling angry and helpless, and withdrawing from an already limited social life does not constitute severe emotional distress).

In the instant case, Cuellar sought no professional counseling nor medical attention for his alleged severe emotional distress. The alleged severe emotional distress included crying once or twice at work, sweating and a fast heart rate the one Saturday that he worked, trouble sleeping, feeling hurt, and feeling embarrassed. Cuellar's emotional distress was not so severe that no reasonable person would be expected to endure such distress. *See Davis,* 66 Ill. 2d at 90.

Alternatively, Cuellar's claim for intentional infliction of emotional distress against Doolittle fails because Cuellar has failed to produce any evidence that Doolittle specifically commanded or expressly authorized Hendricks to act in the alleged tortious manner or that Hendrick's acted as the alter ego of Doolittle.

9

Based on the above, the Defendants' Motion for Summary Judgment as to Cuellar's intentional infliction of emotional distress claim is granted.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. Defendants' Motion for Summary Judgment is granted as to Cuellar's intentional infliction of emotional distress claim and denied as to Cuellar's discrimination claim.

Dated: 7-28-04

/s/ John W. Darrah

JOHN W. DARRAH
United States District Judge